**2014-1173, -1178**

# United States Court of Appeals
# For the Federal Circuit

NAZOMI COMMUNICATIONS, INC.

*Plaintiffs-Appellants,*

*v.*

MICROSOFT MOBILE OY, AMAZON.COM, INC., and VIZIO, INC.,

*Defendants-Appellees.*

––––––––––––––––––

NAZOMI COMMUNICATIONS, INC.

*Plaintiffs-Appellants,*

*v.*

SAMSUNG TELECOMMUNICATIONS, INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA INC., HTC CORP., HTC AMERICA INC., LG ELECTRONICS INC., KYOCERA COMMUNICATIONS INC., LG ELECTRONICS  MOBILECOMM U.S.A., INC., AMAZON.COM, INC., VIZIO, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, ARM, INC., and ARM LTD.,

*Defendants-Appellees.*

*Appeals from the United States District Court for the Northern District of California in No. 5:10-cv-04686-RMW, 5:10-CV-05545-RMW, Senior Judge Ronald M. Whyte.*

**[CORRECTED] BRIEF FOR DEFENDANTS-APPELLEES MICROSOFT MOBILE OY, NOKIA INC., AMAZON.COM, INC., VIZIO, INC., SAMSUNG TELECOMMUNICATIONS, INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA INC., HTC CORP., HTC AMERICA INC., LG ELECTRONICS INC., KYOCERA COMMUNICATIONS INC., LG ELECTRONICS  MOBILECOMM U.S.A., INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, ARM, INC., and ARM LTD.**
**[caption with counsel continues on following pages]**

Kevin P. Anderson
Karin A. Hessler
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006
Telephone:  (202) 719-7000

Attorneys for Defendants-Appellees
ARM, Ltd. and ARM, Inc.

Steven T. Snyder
N.C. Bar No. 40421
KING & SPALDING LLP
100 N. Tryon Street, Suite 3900
Charlotte, NC 28202
Telephone:  (704) 503-2630

Attorney for Defendants-Appellees
Microsoft Mobile Oy and Nokia Inc.

Kevin G. McBride
AKIN GUMP STRAUSS HAUER & FELD LLP
4 Park Plaza, Suite 1900
Irvine, California 92614
Telephone:  (949) 885-4100

Attorney for Defendant-Appellee VIZIO Inc.

Mary-Olga Lovett
Dwayne L. Mason
GREENBERG TRAURIG LLP
1000 Louisiana St. Suite 1700
Houston, Texas 77002
Telephone:  (713) 374-3541

Attorneys for Defendant-Appellee
AMAZON.COM, INC.

Nicholas J. Kim
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. N.W.
Washington, DC 20004
Telephone: (202) 739-3000

Attorney for Defendants-Appellees
LG Electronics Inc. & LG Electronics
MobileComm U.S.A., Inc.

Mark D. Fowler
Robert Buergi
Erik R. Fuehrer
Stanley J. Panikowski
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303
Telephone:  (650) 833-2000

Attorneys for Defendants-Appellees
SAMSUNG
TELECOMMUNICATIONS
AMERICA,     LLC,     SAMSUNG
ELECTRONICS   CO.,   LTD.,   and
SAMSUNG          ELECTRONICS
AMERICA, INC.

John B. Sganga
Amy C Chun
KNOBBE, MARTENS, OLSON &
BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404

Attorneys for Defendants-Appellees
HTC CORPORATION and
HTC AMERICA, INC.

Eric C. Cohen
KATTEN MUCHIN ROSENMAN LLP
525 West. Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200

Attorneys     for     Defendant-Appellee
Kyocera Communications, Inc.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee VIZIO Inc. hereby certifies the following:

1.  The full name of every party or amicus represented by me is:

    VIZIO, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    The real party in interest is the same as the party represented.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    AmTran Technology Co., Ltd.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Kevin G. McBride
    Joanna Kim
    James L. Duncan III
    AKIN GUMP STRAUSS HAUER & FELD LLP

    Evan Simon
    Laurie Michelle Charrington
    JONES DAY

July 14, 2014          By:  */s/ Kevin G. McBride*
                            Kevin G. McBride

                            *Attorney for Defendants-Appellees*
                            VIZIO, INC.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellees LG Electronics Inc. and LG Electronics MobileComm U.S.A., Inc.. hereby certifies the following:

1.    The full name of every party or amicus represented by me is:

    LG Electronics Inc.; and
    LG Electronics MobileComm U.S.A., Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    The real parties in interest are the same as the parties represented.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    LG Corp.; LG Electronics Inc. ; LG Electronics U.S.A., Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| | |
|---|---|
| Nicholas J. Kim | Brett M. Schuman |
| Collin W. Park | Rita E. Tautkus |
| | |
| Morgan, Lewis & Bockius, LLP | Morgan, Lewis & Bockius, LLP |
| Washington, DC | San Francisco, CA |

**MORGAN, LEWIS & BOCKIUS, LLP**

July 14, 2014    By:     */s/ Nicholas J. Kim*
           Nicholas J. Kim

           *Attorney for Defendants-Appellees*
           LG ELECTRONICS INC. and
           LG ELECTRONICS MOBILECOMM U.S.A., INC.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellees HTC Corporation and HTC America Inc. hereby certifies the following:

1.   The full name of every party represented by me is:

    HTC Corporation; and
    HTC America, Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    The real parties in interest are the same as the parties represented.

3.   All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

    HTC America, Inc. is a wholly owned subsidiary of HTC Corporation.
    HTC Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

4.   The name of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this Court are:

> John B. Sganga, Jr.;
> Amy C. Chun;
> Mauricio Uribe; and
> Knobbe, Martens, Olson & Bear, LLP
>
> KNOBBE, MARTENS, OLSON & BEAR, LLP

July 14, 2014            By:  ____*/s/ John B. Sganga*____
                         John B. Sganga, Jr.

                         *Attorney for Defendants-Appellees*
                         HTC CORPORATION and HTC AMERICA, INC.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellees ARM Ltd. and ARM, Inc.. hereby certifies the following:

1.  The full name of every party represented by me is:

    ARM Ltd. and ARM, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    The real parties in interest are the same as the parties represented.

3.  All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

    ARM, Inc. is a wholly owned subsidiary of ARM Ltd.
    ARM Ltd. has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

4.  The name of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this Court are:


Dirk van Ausdall                    George Braxton Newhouse , Jr.
Edward Vincent King , Jr.           Thomas Michael Brown
King & Kelleher, LLP                Brown White & Newhouse LLP
Four Embarcadero Center             333 South Hope Street
17th Floor                          40th Floor
San Francisco, CA 94111             Los Angeles, CA 90071
415-781-2888                        213-613-0500
Fax: 415-781-3011                   Fax: 213-613-0550


Kevin Paul Anderson
Karin Hessler
Robert Scheffel
Wiley Rein LLP

1776 K. Street, N.W.
Washington, DC 20006
202-719-3586

July 14, 2014                    */s/ Kevin P. Anderson* _____

                                 Kevin P. Anderson
                                 kanderson@wileyrein.com
                                 **WILEY REIN LLP**
                                 1776 K Street NW
                                 Washington, DC  20006
                                 Telephone:  202.719.7000
                                 Facsimile:   202.719.7049


                                 *Attorneys for Defendants ARM, Ltd. and
                                 ARM, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellees Samsung Telecommunications America, LLC, Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. hereby certifies the following:

1.     The full name of every party or amicus represented by me is:

Samsung Electronics Co., Ltd., Samsung Telecommunications America, LLC (erroneously sued as Samsung Telecommunications, Inc.) and Samsung Electronics America, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The real parties in interest are the same as the parties represented.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Samsung Telecommunications America, LLC is a wholly owned subsidiary of Samsung Electronics America, Inc., which is a wholly owned subsidiary of Samsung Electronics Co., Ltd.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

DLA Piper LLP (US): Mark D. Fowler, Stanley J. Panikowski, J.D. Harriman, Robert Buergi and Erik R. Fuehrer

July 14, 2014                              Respectfully submitted,

                                         */s/ Erik R. Fuehrer*
                                         Erik R. Fuehrer

                                         *Attorney for Defendants-Appellees,*

*Samsung Telecommunications America, LLC, Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Amazon.com, Inc. hereby certifies the following:

1.  The full name of every party or amicus represented by me is:

    Amazon.com, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    The real parties in interest are the same as the parties represented.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Amazon.com, Inc.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Mary-Olga Lovett; Dwayne L. Mason; Ira R. Hatton of Greenberg Traurig, LLP

July 14, 2014                    ___*/s/ Mary-Olga Lovett*_____
                                 Mary-Olga Lovett


                                 *Attorney for Defendants-Appellees,*
                                 *Amazon.com, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Microsoft Mobile Oy and Nokia Inc. hereby certifies the following:

1.    The full name of every party represented by me is Microsoft Mobile Oy and Nokia Inc.

2.    The name of the real party in interest represented by me is Microsoft Mobile Oy and Nokia Inc..

3.    Nokia Inc. is a wholly-owned subsidiary of Microsoft Mobile Oy, and thus a wholly owned indirect subsidiary of Microsoft Corporation, and no publicly held corporation owns 10% or more of the stock of Nokia Inc.

Microsoft Mobile Oy is a wholly-owned indirect subsidiary of Microsoft Corporation, and no publicly held corporation owns 10% or more of the stock of Microsoft Mobile Oy.

4.    The names of all firms and the partners or associates that appeared for the parties now represented by me in the trial court or are expected to appear in this court are:

King & Spalding LLP: Steven T. Snyder; Cheryl A. Sabnis; Alexas D. Skucas; Donald F. Zimmer, Jr.


July 14, 2014                                 */s/ Steven T. Snyder*
_____

                                             Steven T. Snyder
                                             King & Spalding LLP
                                             100 N. Tryon Street, Suite 3900
                                             Charlotte, NC 28202
                                             Tel.: (704) 503-2600
                                             Fax: (704) 503-2622 ssnyder@kslaw.com

                                             *Counsel for Microsoft Mobile Oy and Nokia Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Kyocera Communications, Inc. hereby certifies the following:

1.    The full name of every party represented by me is:

Kyocera Communications, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The real parties in interest are the same as the parties represented.

3.    All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

Kyocera Corporation, Kyocera International, Inc.

4.    The name of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this Court are:

    Eric C. Cohen
    Michael A. Dorfman
    Eric Carlson
    Kristin L. Holland
    Katten Muchin Rosenman LLP


July 14, 2014            */s/ Eric C. Cohen*
                   Eric C. Cohen

                   *Attorney for Defendant-Appellee*
                   *Kyocera Communications, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................... v

STATEMENT OF RELATED CASES ....................................... viii

STATEMENT OF THE ISSUES ....................................................1

STATEMENT OF THE CASE .........................................................2

STATEMENT OF THE FACTS........................................................5

   I.   COMPUTERS, PROGRAMMING, AND  JAVA ...................5

     A.    Processors and Instructions...................................................5

     B.    The Java Programming Language and Java Bytecodes .................6

     C.    Stack And Register-Based Languages....................................7

   II.  THE HARDWARE PATENTS.............................................7

     A.    Nazomi's Hardware Patents...................................................8

     B.    The History And Prior Litigation Between ARM And Nazomi ...10

   III. THE SOFTWARE PATENT ...............................................13

     A.    The '160 Patent.....................................................................13

       1.   The Java Constant Pool....................................................14

       2.   The Problem: Redundant Steps.........................................15

       3.   The '160 Patent's Alleged "Invention": The Constant Pool's Resolution Data Field........................................................16

     B.    The Accused Android Products .............................................18

SUMMARY OF THE ARGUMENT ..............................................21

I.   The Hardware Patents ......................................................................21

II.  The Software Patent .......................................................................22

ARGUMENT .......................................................................................23

I.   Standard of Review .......................................................................23

II.  The '362 and '436 Hardware Patents ..........................................24

   A.   The District Court Correctly Performed The Same Claim Construction Analysis For The Hardware Patents As In *Nazomi* 2002 And Reached The Same Correct Construction .......24

   B.   The District Court Properly Construed The Term "Instruction" ...........................................................................27

      1.   The Specification Uniformly Describes Only A System In Which Java Is Translated To Native Instructions ...........................................27

         a.   The Specification Describes Only A Translation System ........27

         b.   Nazomi's Cited Passages Confirm That The Specification Does Not Contain Any "Alternative Embodiment" .................31

      2.   The District Court Correctly Relied Upon The Description Of "The Present Invention" To Assist Its Construction ...........................33

      3.   The District Court Correctly Rejected "Nazomi's 'Some Or All' Argument" .........................................................35

      4.   The District Court Accurately Applied Collateral Estoppel For The Construction Of "Instruction" .......................................37

   C.   The District Court Correctly Construed The Remaining Terms ...............................................................................40

   D.   The District Court Properly Granted Summary Judgment of Non-Infringement of the Hardware Patents Under The Doctrine Of Equivalents ................................................42

      1.   The District Court Did Not Abuse Its Discretion in Finding That Nazomi's Assertion of Its Doctrine of Equivalents Theory Was Impermissibly Late ..............................................42

2.    The District Court Correctly Concluded That A Finding of
Equivalence Would Vitiate the "Instruction" Limitation ..................44

3.    The District Court Properly Found That Nazomi Was Collaterally
Estopped From Asserting Infringement Under the Doctrine of
Equivalents ..........................................................................................45

**III. The Software Patent................................................................................46**

**A.    The District Court Properly Construed The Claim Terms Of
The '160 Patent As They Would Have Been Understood By
The Skilled Person At The Time Of The Invention .......................46**

1.    Consistent With The '160 Patent And JVM Specification, The
District Court Properly Defined "constant pool" As "a data
structure attached to a single loaded class that encodes all the
names that can be used by any method in the loaded class"...............46

2.    The Term "indication of a reference that may need resolution"
Was Properly Construed As "an identification of a location (e.g.,
an address) within the constant pool that stores the name, or
'label,' of a reference that needs resolution" ......................................52

3.    The Term "Instruction" Was Properly Construed ..............................60

**B.    The District Court Properly Granted Summary Judgment of
Non-Infringement of the '160 Patent................................................61**

1.    The Accused Products..........................................................................61

2.    The District Court Properly Granted Summary Judgment of Non-
Infringement Based on the "Constant Pool" Limitation.....................62

c.    Nazomi Conceded That The Accused Products Do Not
Literally Include A "Constant Pool" Under The District
Court's Construction ...............................................................62

d.    As The District Court Correctly Found, Nazomi Waived The
Doctrine of Equivalents ..........................................................63

e.    The District Court Correctly Found, In The Alternative, That
Nazomi Failed To Raise Any Issues of Fact Under The
Doctrine of Equivalents ..........................................................63

3.   The District Court Properly Granted Summary Judgment of Non-Infringement Based on the "Indication of a Reference That May Need Resolution" Limitation ............................................................69

**CONCLUSION** ....................................................................................**70**

**CERTIFICATE OF SERVICE** ......................................................**77**

**CERTIFICATE OF COMPLIANCE** .............................................**78**

# TABLE OF AUTHORITIES

**Cases**

*A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed. Cir. 1983) ........................39

*Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121 (Fed. Cir. 2011)....
................................................................................................................ 34, 35

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264 (Fed. Cir. 2011) .............31

*Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318 (Fed. Cir. 2011)..........64

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) ......69

*Arthur  A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000)
............................................................................................................................50

*Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377 (Fed. Cir. 2013) ... 38, 46

*Athletic Alternatives, Inc. v. Prince Mfg. Inc.*, 73 F.3d 1573(Fed. Cir. 1996) ........51

*Augme Techs. Inc. v. Yahoo! Inc.*, 2014 U.S. App. LEXIS 11606 (Fed. Cir. June
20, 2014) ................................................................................................. passim

*Bell Atl. Network Servs. v. Covad Commc'ns Group*, 262 F.3d 1258 (Fed. Cir.
2001) ................................................................................................................30

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006)................................54

*Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342 (Fed. Cir. 2013)…
................................................................................................................ 44, 45

*Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365 (Fed. Cir. 2006) ..........................44

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc)..........23

*DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314 (Fed. Cir. 2001) ..................45

*Digital-Vending Services Int'l, LLC, v. The Univ. of Phoenix, Inc.*, 672 F.3d 1270
(Fed. Cir. 2012) ...............................................................................................52

*France Telecom S.A. v. Marvell Semiconductor, Inc.*, No. 12-cv-4967, 2014 WL
1899616 (N.D. Cal. May 12, 2014)..................................................................43

*Gemalto S.A., v. HTC Corp.*, 2014 U.S. App. LEXIS 11520 (Fed. Cir. June 19, 2014) ................................................................................. 64, 69

*Gen. Elec. v. Nintendo Co.*, 179 F.3d 1350 (Fed. Cir. 1999) ..................................65

*Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761 (Fed. Cir. 2002) .............................43

*Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379 (Fed. Cir. 2008)..53

*Hologic, Inc. v. Senorx, Inc.*, 639 F.3d 1329 (Fed. Cir. 2011) ...............................31

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) .............34

*In re Freeman*, 30 F.3d 1459 (Fed. Cir. 1994) .......................................................39

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006) .................50

*Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350 (Fed. Cir. 2012) ....34

*Markman v. Westview Instruments*, 517 U.S. 370 (1996) ........................................31

*Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091 (Fed. Cir. 2000).......44

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473 (Fed. Cir. 1998)........60

*Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306 (Fed. Cir. 2001) ..........39

*Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 266 Fed. App'x 935 (Fed. Cir. 2008) ........................................................................................... passim

*Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364 (Fed. Cir. 2005) ................................................................................................. passim

*Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, Case No. C 02-2521 JF, 2003 U.S. Dist. LEXIS 26380 (N.D. Cal. Sept. 30, 2003)..................................... ix, 25

*Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, Case No. C 02-2521 JF, 2006 U.S. Dist. LEXIS 66354 (N.D. Cal. Sept. 6, 2006)..................................... passim

*Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1139 (Fed. Cir. 2014) ........ viii, 7

*Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005) 64, 67

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................. 47, 54

*Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008)............................50

*Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081 (Fed. Cir. 2003) .............. 34, 35

*Realtime Data, LLC v. Morgan Stanley*, 554 F. App'x 923 (Fed. Cir. 2014) .........23

*Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929 (Fed. Cir. 2013) ................................................................................................. 30, 34

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001)..........................................................................................................44

*Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361 (Fed. Cir. 2005)............. 51, 60

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271 (Fed. Cir. 2013) ................................................................................................................34

*Sunpower Corp. Sys. v. Sunlink Corp.*,  2009 WL 1657987 (N.D. Cal. June 12, 2009)............................................................................................................43

*Technology Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir.  2012) ..31

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363 (Fed. Cir. 2013), *cert. granted*, 134 S. Ct. 1761 (2014).........................................................................23

*Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed. Cir. 1996) ...................................................................................................64

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) .34

*V-Formation v. Benneton Group SPA*, 401 F.3d 1307 (Fed. Cir. 2005) ................49

*Warner-Jenkinson Co., Inc.v. Hilton Davis Chemical Co.*, 520 U.S. 17 (1997).....65

## STATEMENT OF RELATED CASES

Appellees certify that, to their knowledge, with the exception noted below, no appeal from this civil action was previously before this or any other appellate court.  Further, there is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

This case is related to Case No. 2013-1165 decided by this Court in January 2014 because the present case arises out of the same district court case, concerns the same patents and involves the same accused technology.  *See Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1139 (Fed. Cir. 2014).  Case No. 2013-1165 involved defendants (Western Digital and Sling Media) that sold products containing processors having the accused ARM technology but which could not activate or enable that technology.  This Court determined that such products were not capable of infringement.

This case is related to the previous cases between Nazomi and ARM before this Court in that those cases considered an ancestor patent with the same specification and, for all purposes relevant to the present dispute, the same ARM accused technology ("*Nazomi* 2002").  *See* Case Nos. 2007-1190 and 2004-1101. *See also Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364 (Fed. Cir. 2005); *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 266 Fed. App'x 935 (Fed.

Cir. 2008); *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, Case No. C 02-2521 JF, 2006 U.S. Dist. LEXIS 66354 (N.D. Cal. Sept. 6, 2006); *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, Case No. C 02-2521 JF, 2003 U.S. Dist. LEXIS 26380 (N.D. Cal. Sept. 30, 2003).

## STATEMENT OF THE ISSUES

Whether the district court correctly:

1. Reached the same result that this Court and Judge Fogel (N.D. Cal.) previously each reached twice in construing "instruction" and in determining that Nazomi's specification teaches only the translation of stack-based instructions to register-based instructions.

2. Granted summary judgment against Nazomi's assertion of the doctrine of equivalents ("DOE") for the hardware patents because: (a) it properly exercised its discretion to determine that the DOE assertion was too late; (b) the DOE would vitiate a claim element; and (c) collateral estoppel precluded the DOE assertion.

3. Construed the claim terms "constant pool" and "indication of a reference that may need resolution" consistent with how a skilled person would have understood those terms.

4. Granted summary judgment against Nazomi's assertion of the DOE for the software patent because: (a) it properly exercised its discretion to determine that the DOE assertion was too late; and (b) the DOE assertion was merely conclusory and did not create an issue of fact.

## STATEMENT OF THE CASE

The three patents in this case all relate to enhancing the execution of Java programs. Two of them, the '362 and '436 patents (collectively the "hardware patents"), relate to a "hardware Java accelerator." A283; A302. The third—the '160 patent (the "software patent")—is directed to an "implementation of Java," A264, in which a field is added to the Java "constant pool" to avoid redundant steps by the Java Virtual Machine ("JVM").

All three patents are based in part on a parent application, which eventually matured into U.S. Patent No. 6,332,215. A264-A282; A283-A301; A302-A331. Nazomi unsuccessfully asserted the '215 patent against ARM in a case filed in 2002. *Nazomi Commc'ns Inc. v. ARM Holdings, PLC*, 403 F.3d 1364 (Fed. Cir. 2005), 266 F. App'x 935 (Fed. Cir. 2008) .

The hardware patents are directed to the same type of hardware Java accelerator that was before this Court in the *Nazomi* 2002 case, with claims re-drafted in an attempt to avoid the non-infringement holding of that case. The products accused of infringing the hardware patents all include ARM-designed processor cores.

The software patent is a continuation-in-part of the parent application and contains claims directed to less than two columns of new matter. A281, 7:35–60; A279, 3:15–17. The products accused of infringing the software patent all run

2

Google's Android operating system, which includes a Dalvik Virtual Machine for running Dalvik programs.

Judge Whyte had the benefit of two separate full-day technology tutorials with extensive presentations from both sides. On August 5, 2012, Judge Whyte conducted a technology tutorial to prepare for the hearing related to his ruling on the "capable of" issue—a ruling that this Court affirmed. *See Nazomi*, 739 F.3d 1139. Subsequently, the remaining parties filed claim construction briefs and the Defendants filed motions for summary judgment of non-infringement and invalidity separately for the hardware and software patents.

Judge Whyte conducted another lengthy tutorial on November 19, 2012 with presentations on the technologies implicated in the claim construction and summary judgment motions for all three patents. A259. On November 28, 2012, Judge Whyte held another day-long hearing with extensive presentations on all three patents. *Id. See* A6047–A6301 (tutorials); A4586–A4749 (oral argument transcripts).

Judge Whyte granted summary judgment of non-infringement for the hardware patents. He ruled just as Judge Fogel and this Court previously had, that Nazomi's specifications disclosed only a system which translated stack-based instructions to register-based instructions and found that ARM's processor cores,

3

which require special software to implement hardware acceleration, were not covered by the claims of Nazomi's hardware patents.  A21–A51.

For the software patent, Judge Whyte construed the claimed "constant pool," A55–A58, and "indication of a reference that may need resolution," A62–A65, consistently with the understanding of one of ordinary skill.  Judge Whyte granted Defendants' motion for summary judgment of non-infringement, ruling that the asserted claims did not cover the accused Dalvik Virtual Machine.  A80–A91.

Judge Whyte also found the pending invalidity motions moot, A51, A91, and entered final judgment in favor of all Defendants, A193, A4751–A4752.  Nazomi appeals the district court's claim construction orders and grants of summary judgment of non-infringement.

4

## STATEMENT OF THE FACTS

The three patents-in-suit are directed to speeding up the processing of Java computer programs. There is otherwise little overlap between the hardware and software patents. The three tutorials presented to Judge Whyte provide a detailed understanding of the technologies for reference. A6047–A6301. Common facts are discussed in Section I. Sections II and III separately discuss relevant facts and background for the hardware and software patents.

## I.  COMPUTERS, PROGRAMMING, AND JAVA

### A. Processors and Instructions

Computer processors consist of functional units of hardware controlled electronically to perform computing functions. These functional units are made up primarily of memory and logic units, which are controlled by electrical signals referred to as "control signals." A488–A499. Modern computers typically have a central processing unit ("CPU") that includes circuitry to fetch, decode, and execute instructions or groups of instructions. This circuitry is shown in block 26 and described as the "pipeline" of the CPU in Figure 3 and at 5:20–25 of the '362 patent. A287; A297.[1] The "fetch" stage of the pipeline, block 26a, retrieves each successive instruction provided to the CPU and passes it to the "decode" stage, block 26b.

---

[1] For the hardware patents, the citations herein refer to the '362 patent.

The decode stage (or "decoder") is designed to recognize each instruction and to generate control signals that cause various units within the CPU to carry out the appropriate operations. The "execute" stage, block 26c, consists of functional units such as adders, shifters and multipliers that are manipulated by the control signals. In response to the control signals generated by the decoder, the execute stage performs the various operations required to implement the instruction.

Computer programs are a series of individual discrete steps that the programmer wants the computer to perform. Most programs are written in a high-level programming language comprising words and phrases available to the programmer for use as commands. These high-level programming statements are known as the "source code." Source code is eventually translated into control signals for the hardware components.

### B. The Java Programming Language and Java Bytecodes

The Java programming language allows Java programs to run on different types of hardware without rewriting the Java programs for each hardware type. A278, 1:39–44; A2083; A3940. In conventional languages, source code is compiled into machine code specific to the system's processor. A278, 1:19–23. In contrast, Java source code is translated into Java bytecodes, which are instructions not specific to any processor. *Id.*, 1:32–34. The Java bytecodes are later translated

into processor-specific native instructions by a bytecode interpreter, which is one component of the Java Virtual Machine. *Id.*, 1:34–38.

### C. Stack And Register-Based Languages

The Nazomi/ARM decisions all discussed differences between stack-based and register-based languages. *E.g.*, *Nazomi*, 403 F.3d at 1366; *Nazomi*, 739 F.3d at 1339–41. The important distinction is "Java bytecodes are written for computers that use a 'stack-based' approach, whereas most modern processors use a 'register-based' approach." *Nazomi*, 403 F.3d at 1366. Thus, "[t]ranslation of Java bytecodes into a form usable by register-based processors requires translation of Java bytecodes into the 'native instructions' of a register-based processor." *Id.*

Prior art systems used a software translation to convert Java bytecodes to register-based instructions. *Id.* The specification of the hardware patents "discloses a hardware Java accelerator that translates stack-based Java bytecode instructions into register-based 'native' instructions that are usable by a register-based processor." *Id.*; *see also Nazomi*, 2008 U.S. App. Lexis 3663, at *2; *Nazomi*, 2008 U.S. Dist. LEXIS 66365, at *2–4. *See also* A6120–A6125; A6057–A6076.

## II. THE HARDWARE PATENTS

The hardware patents are, for all relevant purposes, identical to the ancestor '215 patent that Judge Fogel and this Court repeatedly construed in the *Nazomi*

2002 case where Nazomi asserted that patent against ARM. The opinions in the *Nazomi* 2002 litigation provide additional detail on the underlying technology.

### A. Nazomi's Hardware Patents

The '362 patent "generally relates to a Java hardware accelerator which can be used to quickly translate Java bytecodes into native instructions." A295, 2:7–9. The patent explains that JVM software for converting Java instructions to native instructions is either too slow or requires too much memory for some applications. *Id.*, 1:42–67. To solve this bottleneck problem, the patent teaches the use of hardware to accelerate the conversion of Java bytecode instructions into native instructions. *See id.*, 2:10–31; *Nazomi*, 2006 U.S. Dist. LEXIS 66354, at *2-4. *See* A6126-A6143 (tutorial).

Figure 4 shows the operation of Nazomi's hardware accelerator (the "Java Instruction Translation Unit," 42).



FIG._4

A288.    This unit receives each incoming Java instruction and identifies the corresponding native instruction in look-up table 78.  The native instruction is then sent from the look-up table into a buffer (a type of memory) that holds it until it is fetched for decoding and execution by the pipeline of the CPU.  *See* A297, 5:26–56.

Figure 3 of the '362 patent shows the placement of the "Java Instruction Translation Unit," 42, relative to the CPU of the computer.



*FIG. 3*

A287.

The output of the hardware acceleration unit is connected to the input of the CPU pipeline through multiplexer block 28, which functions as a switch.  The multiplexer allows native instructions to pass directly from the instruction cache 24

into the pipeline 26 of the CPU without passing through the hardware accelerator. Java instructions, however, first pass through the hardware accelerator for translation, after which the corresponding native instruction is passed on through multiplexer 28 and into the fetch stage 26a of the CPU pipeline. A296, 4:4–5:25. The Nazomi patents do not contain any teaching that would alter the sequence or physical arrangement of the functional blocks shown in Figure 3.

## B. The History And Prior Litigation Between ARM And Nazomi

Nazomi has asserted its patents against ARM without success since 2002, when Nazomi sued ARM for patent infringement on the '215 patent, an ancestor of the hardware patents asserted here. In *Nazomi* 2002, both Judge Fogel and this Court issued opinions devoted to "instruction" in the context of the asserted patents' specification. This Court affirmed Judge Fogel's following construction of "instruction":

> Consistent with the <u>manner in which the inventor defined the term</u>, the Court construes the term "instruction" to mean either a stack-based instruction that is to be translated into a register-based instruction, or a register-based instruction that is input to the CPU pipeline. In either case the "instruction" must be upstream of the decode stage of the CPU pipeline. As used in the claims of the patent, "instruction" cannot mean the control signals that are the output of the decode stage.

2006 U.S. Dist. LEXIS 66354, at *22–23; *affirmed* 266 F. App'x 935, 937 (Fed. Cir. 2008) (emphasis added[2]). The outcome of this litigation turned entirely on the

---

[2] The use of <u>underlining</u> indicates emphasis added herein, unless otherwise stated.

meaning of "instructions." *Nazomi*, 403 F.3d at 1369 ("only claim term disputed

both below and on appeal is 'instruction'"); *Nazomi,* 266 F. App'x at 937

("Nazomi argues that the district court erred in construing the term 'instructions'").

The following drawings illustrate the critical distinction litigated in *Nazomi*

2002 starting with Nazomi's Figure 3:



*FIG._3*

A287.   In Nazomi's patents, the "stack-based" instructions are processed by

"JAVA Accelerator Instruction Translator 42," which translates/converts those

stack-based instructions to "register-based" instructions.    The "register-based"

instructions" are then processed by "Instruction Fetch" and "Instruction Decode"

into control signals which control the "execute logic."

The second drawing submitted in *Nazomi* 2002 explained the differences between Nazomi's and ARM's technologies.[3]   ARM processors execute register-based ARM instructions "natively."   The ARM processors also include a combination of hardware and software called Jazelle which helps process stack-based instructions.  A490–A492.



FIGURE S2 (REVISION 3)

A498.[4]

In contrast to Nazomi's conversion steps (i.e., stack-based instructions to register-based instructions and then to control signals), ARM's Jazelle technology

---

[3] The currently-accused ARM processors function (in relevant respects) identically to those accused in *Nazomi* 2002.  *See* A572–A575.

[4] Nazomi's discussion of "Revision 2" technology, Brief at 21–23, is inapplicable. Revision 2 was dismissed from *Nazomi* 2002.  *Nazomi*, 2006 U.S. Dist. LEXIS 66354, at *6–7.  The only current relevance is to highlight that Revision 3 processors were specifically designed to not perform the translation that is Nazomi's purported invention.

does not "convert" Java instructions into ARM instructions. Instead, Jazelle contains a separate Java decoder that recognizes and processes Java bytecodes directly to generate the control signals necessary to carry out the specified operations. There is no need to generate native ARM instructions and no intermediate conversion to "register-based instructions." *See* A6144–A6149; A6077–A6105 (ARM tutorials).

This dispositive difference drove Judge Fogel's and this Court's prior conclusions that Nazomi's patent described only a system which converted from stack-based instructions to register-based instructions. This same distinction between Nazomi's disclosed invention and the technology that ARM re-designed in 2002 forms the basis for the ruling on the hardware patents in the present case.

## III.   THE SOFTWARE PATENT

### A. The '160 Patent

The '160 patent "is generally directed to a method of running programs written in the Java programming language." Appellants' Opening Brief ("Brief") at 13. The alleged invention is a specific method of processing Java programs in which a "Resolution Data Field" is used in entries in "the constant pool" to avoid repeating the step of "resolv[ing] the reference" (*i.e.*, locating an object and loading it into memory). A278, 1:53–59, 2:19–20. The constant pool stores constants that "encode all the names (of variables, methods, and so forth) used by

13

any method in the class." A281, 7:45–47. The asserted method claims all require the steps of "obtaining . . . an instruction that references <u>an entry in a constant pool</u>, the <u>constant pool entry</u> storing <u>an indication of a reference that may need resolution</u>; obtaining data from the <u>constant pool entry</u> including data from <u>a resolution data field</u>; [and] using data from <u>the resolution data field</u> to determine whether to do a resolving step." A282, 10:1-8 (emphasis added). As described below, the patent makes clear that the claimed "constant pool" is the Java constant pool.

### 1. The Java Constant Pool

A Java program is made up of a collection of Java files, which include "class" files and other data. A2081-A2095 at A2083–A2084. Each Java class file defines the behavior and state of objects of that class for the corresponding program. *Id.* The prior art Java Virtual Machine Specification ("JVM Specification"), referenced by the '160 patent, A278, 1:62-63, defines the constant pool—a term of art particular to Java—as follows:

> [A] *per-class* or per-interface runtime representation of the constant_pool table in a [Java] class file . . . . It contains several kinds of constants, ranging from numeric literals known at compile time to method and field references that must be resolved at run time. The runtime constant pool serves a function similar to that of a symbol table for a conventional programming language, although it contains a wider range of data than a typical symbol table. . . . The runtime constant pool for a class or interference is [constructed/created] when [a

14

> Java class file for the] class or interface is
> [created/loaded] . . .

A57 (citing 1st (A1113-A1118; A1197) and 2d (A2059-A2066; A2065) editions of

JVM Specification). The parties' experts agree that the JVM Specification is an

authoritative reference. A3941 (acknowledging that the JVM Specification

"provides a general guide as to the implementation of a JVM"); A2086 (noting that

the JVM Specification describes "the structure of a JVM in general terms to aid in

understanding"). Moreover, the definition in the JVM Specification is consistent

with the '160 patent's description of the constant pool:

> Every currently loaded class has a constant pool attached
> to it. The constant pool is allocated when a class is first
> loaded, the constants in this pool encode all the names (of
> variables, methods, and so forth) used by any method in
> the class.

A281, 7:43–47; A746; A2087; A2092–A2093.

## 2. The Problem: Redundant Steps

An instruction that references the constant pool normally requires

"resolving" the reference (*i.e.*, searching for the corresponding object and loading

it into memory). A2086. Conventionally, the reference had to be resolved each

time the instruction was run, which took a considerable amount of time. A278,

1:53–59. The '160 patent acknowledges that this was a recognized problem with

Java and mentions a prior art solution called "quick variants," which had certain

limitations.   A278, 1:60–2:12; *see also* A956–A957 (prior art JVM Specification

discussing "quick variants").

### 3. The '160 Patent's Alleged "Invention": The Constant Pool's Resolution Data Field

The '160 patent discloses a very specific method to avoid some of the

problems of the prior art.  A278, 2:20–39.  The patent specifically identifies "the

invention" as the addition of a field called the "Resolution Data Field" or "Data

Resolution Field" to the constant pool:

> The present invention, a Resolution Data Field, is used in the constant pool entries.

A278, 2:20–21 (Summary of the Invention); *see also* A264 (Abstract).

Figure 9A illustrates a constant pool entry that includes an Indication Field

162, which stores an indication of a reference that may need resolution, and a

Resolution Data Field 160, which stores data indicating whether the reference has

been resolved.  A281, 8:17-51.  In Figure 9A, the Resolution Data Field 160 has

the value "0" 152a indicating that the corresponding reference has not been

resolved.  A275, Fig. 9A; A281, 8:17–51.



A275, Fig. 9A (italicized annotations added). All of the asserted claims require that the Resolution Data Field be located <u>within the constant pool entry</u>. A282, 9:44-10:40 (asserted claims 11, 15, 18, and 21) ("obtaining data <u>from the constant pool entry</u>, including data from <u>a resolution data field</u>").

The location of the "resolution data field" within the constant pool is important, as the prior art JVM Specification disclosed the same "resolution data field," stored outside of the constant pool in a single-field array, to indicate whether a reference had been resolved. A957; A3957. The prior art constant pool and the corresponding resolution data field is shown below, where the value in the "second array" indicates whether the reference has been resolved.

17



A2093.  In opposition to Appellees' motion for summary judgment of invalidity, Nazomi distinguished the foregoing portion of the JVM specification, arguing that its "resolution data field" is <u>within the constant pool entry</u>, while the prior art array is "separate" from the constant pool.  A3956–A3957; A3590.

### B. The Accused Android Products

The accused products all run Google's Android operating system, which includes the Dalvik Virtual Machine ("DVM") for executing Dalvik programs. A2087.  Nazomi conceded that the accused products cannot run Java programs, A3942, but interchangeably pointed to Dalvik's ".dex" file and pResMethods data structure in support of its infringement arguments. *E.g.*, A82.

The Dalvik ".dex" file (the "Dex file") includes a shared constant pool with all of the constants used by all of the classes in an entire Dalvik program. A2088;

18

A3943–A3944. Unlike the Java constant pool, the Dex file constant pool is not tied to a single class, the Dex file constant pool is not allocated to memory, and the Dex file constant pool is not modified during execution. A2088-A2089. Thus, the Dex file has many differences from the Java constant pool.

In its statement of facts, Nazomi incorrectly states that "the Davlik VM allocates a runtime constant pool" and that "[t]his constant pool includes the constants (*e.g.*, method names, variable names) associated with the different classes." Brief at 18–19 (citing A3943–A3946). However, the cited testimony never uses the term "runtime constant pool," and never states that the alleged Dex file constant pool, which includes the constants, is ever allocated at runtime. Nazomi makes a similar misstatement in citing to a portion of the district court's order while discussing the Dex file's shared constant pool. Brief at 19. Nazomi inaccurately states that "[t]his runtime constant pool is defined within the DvmDex data structure." *Id.*

Nazomi contends that the Dex file is "associated with" an array called pResMethods, which is not included in the Dex file. A3945. pResMethods is an array created at runtime in the DVM that includes only a single field for each entry, A3563–A3564, where each field is initialized to 0 and then updated to store the address of a loaded object after resolution, *id.* (citing to A2091). Nazomi used a depiction of pResMethods as shown below.



A3564.   In the district court, Nazomi unsuccessfully argued that pResMethods constituted the "indication of a reference that may need resolution" and "resolution data field" in the claimed constant pool.  A89–A90.

# SUMMARY OF THE ARGUMENT

## I.    THE HARDWARE PATENTS

Judge Whyte correctly did exactly what Judge Fogel and this Court previously did twice:  review Nazomi's specification and construe the disputed terms in light of that specification.  Nazomi's purported invention consistently, repeatedly, and singularly describes only a system in which stack-based instructions are translated into register-based instructions.  403 F.3d at 1366.  No one – not even Nazomi in the present appeal – has ever identified any alternative embodiment in which translation was not performed.  *Id.*

Nazomi's main argument against summary judgment is that it was surprised by ARM's claim construction and therefore was excused from complying with the local rules regarding assertions of the doctrine of equivalents ("DOE").  This simply begs belief in light of the 12+ years of litigation.  The district court was within its discretion to deny Nazomi's last-ditch assertion of DOE almost 3 years after the original Complaint was filed.  Moreover, the DOE would vitiate the construction of "instruction" over which the parties have long litigated.  Finally, Nazomi previously stipulated to no infringement under the same claim construction against the same accused products, and the district court correctly held that Nazomi should not be heard to re-litigate that stipulation.

## II.    THE SOFTWARE PATENT

Citing Nazomi's own expert, the district court correctly concluded that "'constant pool' and 'constant pool entry' were terms of art particular to Java." A56.  Consistent with the '160 patent and JVM Specification, the district court found that one of ordinary skill in the art would have defined "constant pool" as "a data structure attached to a single loaded class that encodes all the names that can be used by any method in the loaded class."  Nazomi provides no evidence that a skilled person would have had defined "constant pool" differently. Nazomi concedes that the accused devices do not literally include the "constant pool" limitation under the district court's construction.  Noting that Nazomi waived its rights under the DOE under the Patent Local Rules, the district court also correctly found that the conclusory statements in Nazomi's expert declaration were insufficient to raise an issue of fact.

As a separate and independent basis of non-infringement, the district court correctly construed "indication of a reference that may need resolution" in a manner that did not conflate it with the "resolution data field" limitation. Nazomi concedes that under the district court's construction, this limitation <u>is simply not found</u> in the DVM, irrespective of whether or not the data field in pResMethods array could be a data resolution field.  Brief at 47.

22

# <u>ARGUMENT</u>

## I.    STANDARD OF REVIEW

Claim construction is reviewed de novo, *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc), but that "does not mean that the reviewing court will attach no weight to the conclusion reached by the tribunal it reviews." *Cybor*, 138 F.3d at 1463 (Bryson, J., concurring).  This is particularly true for factual determinations regarding how one of skill in the art interprets the claims.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363 (Fed. Cir. 2013), *cert. granted*, 134 S. Ct. 1761 (2014) (granting certiorari on deference issue).  Appellees submit that this Court should give deference to Judge Whyte's fact findings on claim construction in light of the significant time and effort that he spent on all of the tutorials, briefings, hearings, and opinions.

"The Ninth Circuit reviews the grant of summary judgment *de novo*." *Augme Techs. Inc. v. Yahoo! Inc.*, 2014 U.S. App. LEXIS 11606, at *3 (Fed. Cir. June 20, 2014).  The district court's decision to exclude the doctrine of equivalents assertions as untimely under the local rules is reviewed for an abuse of discretion. *Realtime Data, LLC v. Morgan Stanley*, 554 F. App'x 923, 937–38 (Fed. Cir. 2014).

## II. THE '362 AND '436 HARDWARE PATENTS

### A. The District Court Correctly Performed The Same Claim Construction Analysis For The Hardware Patents As In *Nazomi 2002* And Reached The Same Correct Construction

The hardware patents issues remain the same as they have since *Nazomi 2002*: the meaning of "instruction" and whether Nazomi's description of only a system which translates stack-based instructions into register-based instructions can be expanded to cover ARM's products that were specifically re-designed to avoid such a translation system. Nothing has changed since 2002. ARM's products remain the same for all relevant purposes. Because the hardware patents are continuations of the '215 patent disputed in *Nazomi 2002*, Nazomi's disclosure remains the same.[5]

Judge Whyte reached the same conclusion that Judge Fogel reached twice: Nazomi's claims should be construed in light of the specification's disclosure of only a translation system. This Court affirmed that conclusion. Judge Whyte's and Judge Fogel's decisions were based on extensive proceedings and a thorough understanding of the technology. Judge Whyte had the benefit of two separate full-day technology tutorials and two separate full-day oral arguments on the technology. *See* A6047-A6301 (tutorials); A4586-A4749. Similarly, Judge Fogel

---

[5] The '436 patent is a continuation-in-part, but the new matter merely provides details about the instruction translation unit that translates bytecodes into native instructions. A302–A331, Figs. 8–20, 8:32–14:9.

held multiple hearings and took extrinsic evidence.  *See Nazomi*, 2006 U.S. Dist. LEXIS 66354; *Nazomi*, 2003 U.S. Dist. LEXIS 26380.

Two crucial facts stand out from the decade-plus of extensive proceedings before Judge Whyte, Judge Fogel, and this Court.  First, Nazomi never produced a shred of evidence that its inventors actually conceived of (or disclosed) an invention broader than the stack-to-register instruction translation system found in the asserted patents.  There is simply nothing to support Nazomi's case: nothing in the specification, no contemporaneous emails/documents, and no inventor notebooks.  Only after seeing ARM's re-designed product in 2002 did Nazomi first attempt to expand its invention disclosure beyond a translation-based system.  Second, every Court that reviewed this intrinsic record consistently refused to expand Nazomi's claims to encompass the entirely distinct ARM system that Nazomi accuses of infringement.  Indeed, Nazomi faces the same problem it has faced since Judge Fogel's first 2003 decision:  Sun's picoJava processors (prior art which Nazomi distinguished) operated like ARM's processors do – both without translation.  266 Fed. App'x at 940.

Nazomi ignores the specific determinations that Judge Fogel and this Court made.  For example, the specification "discloses a hardware Java accelerator that translates stack-based Java bytecode instructions into register-based 'native' instructions that are usable by a register-based processor."  413 F.3d at 1366.  This

Court and Judge Fogel extensively reviewed the specification and uniformly concluded that there was no disclosure other than a translation system. *E.g.*, 2008 U.S. App. Lexis 3663 at *13–16; 2006 U.S. Dist. Lexis 66354, at *18–21.

Nazomi, of necessity, seeks to hide from the actual invention disclosure. Instead of discussing "what the inventors actually invented" in 1998, Nazomi reviews claim language in isolation from the specification – language that was first introduced five years after the 1998 application filing. A608–A628. This is contrary to this Court's precedent.

Nazomi's opening brief does not recite <u>anywhere</u> Nazomi's proposed construction of "instruction." Nazomi does not attempt to explain affirmatively how the intrinsic record supports its proposed construction – because that construction is not sustainable in light of the specification.[6]

In the rare instances in which Nazomi discusses the specification, Nazomi focuses on sporadic references to the word "embodiment" as though it is a talisman capable of expanding what the inventors actually invented. It is not the incantation

---

[6] Nazomi's argument regarding the definition of stack-based instructions is pure semantics that seeks to exalt form over substance. Brief at 51. The actual dispute between the parties was, and is, the definition of "instruction" and the requirement for translation from stack-based to register-based instructions. The parties' quibbling over minor distinctions in the meaning of "stack-based instructions" was, at best, a sideshow that was briefed with only a single sparse paragraph by each side in the briefing. A3992, A4296, A4780. Nazomi's semantical arguments were not raised below and provide no reason to disrupt the district court's "instruction" construction.

of the word "embodiment" that expands an invention's disclosure – it is the actual

technical disclosure of different systems – a disclosure that Nazomi's specification

lacks.

Judge Whyte correctly construed the claims and granted summary judgment.

Nazomi does not present any reasoned basis to disturb the district court's rulings.

### B. The District Court Properly Construed The Term "Instruction"

#### 1. The Specification Uniformly Describes Only A System In Which Java Is Translated To Native Instructions

##### a. The Specification Describes Only A Translation System

Nazomi's specification describes only a system that translates from stack-

based to register-based instructions.  The Summary of the Invention summarizes

Nazomi's invention:

> The present invention generally relates to a Java$^{TM}$ hardware accelerator
> which can be used to quickly translate Java$^{TM}$ bytecodes into native
> instructions for a central processing unit (CPU).  The hardware
> accelerator speeds up the processing of the Java$^{TM}$ bytecodes
> significantly because it removes the bottleneck which previously
> occurred when the Java$^{TM}$ Virtual Machine is run in software on the
> CPU to translate Java$^{TM}$ bytecodes into native instructions.…  The
> hardware Java$^{TM}$ accelerator can convert the stack-based Java$^{TM}$
> bytecodes into a register-based native instructions on a CPU. The
> hardware accelerators of the present invention are not limited for- use
> with Java$^{TM}$ language and can be used with any stack-based language
> that is to be converted to register-based native instructions.

A295, 2:7-31 (emphasis added).  Every aspect of Nazomi's specification relates to

translating or converting stack-based instructions into register-based instructions.

The Detailed Description teaches the problem is the "bottleneck" in "translating" Java to native instructions.

> The Java[TM] hardware accelerator 22 allows part of the Java[TM] Virtual Machine to be implemented in hardware. This hardware implementation speeds up the <u>processing of the Java™ byte codes</u>. In particular, in a preferred embodiment, <u>the translation</u> of the Java™ bytecodes into <u>native processor instructions</u> is at least partially done in the hardware Java™ accelerator 22. <u>This translation has been part of a bottleneck</u> in the Java[TM] Virtual Machine when implemented in software.

A294-A296, 2:61-3:2. This passage equates "the processing of Java bytecodes" with "the translation"—which reflects the nature of Nazomi's invention—to replace translation previously done in software with hardware translation.

Every portion of Nazomi's specification is crafted to support translation. "The central processing unit has a Java hardware accelerator subunit to translate Java[TM] bytecode into the native instructions." A296, 3:42-44. "In the Java™ hardware accelerator mode, Java bytecode is transferred to the Java™ hardware accelerator 22, converted into native instructions…" *Id.*, 3:54-56.

Nazomi's inventors devote the bulk of their patents to details of their "instruction translation Unit [which] is used to convert Java bytecodes to native instructions." A296, 4:7-9. Columns 4, 5, 6, and 7 are used to describe different aspects of this "instruction translation unit." In one aspect, the "instruction translator" operates such that "multiple bytecodes may be converted into a lesser number of native instructions." A297, 5:32-34. In another aspect, the "instruction

translator" contains a "state machine [that] converts the bytecodes into native instructions using the look-up table 78." *Id.*, 5:39-41. The "state machine" includes a "buffer [that] supplies the translated native instructions to the CPU." *Id.*, 5:55-56.

In the operation of Nazomi's invention, the "Java translating machine translates the Java bytecode into a native instruction ..." A297, 5:59-66. Nazomi's inventors then caution that the "Java instruction translation must be done so as to avoid pipeline hazards in the instruction translation unit." *Id.*, 6:43-45. Nazomi's inventors teach that the "Java™ bytecodes iload_n and iadd are converted by the Java™ bytecode translator to the single native instruction ADD R6, Rl" which shows that "the Java™ hardware translator can combine the [Java bytecodes] into a single native instruction." *Id.*, 6:46-55. Nazomi's "Java accelerator instruction translation unit" is advantageous because of speed, ability to use legacy software, and scalability. *E.g.*, A296, 3:31-35, A298, 7:4-15.

To cite all aspects of Nazomi's "translation" invention requires copying the specification into this brief. However, express references to Nazomi's translation invention appear in at least the following: A295-A298, 2:8, 2:14, 2:23; 2:28; 2:65-67, 3:3-5, 3:43, 3:56; 3:63, 4:8-12, 4:30, 4:38, 4:58, 5:17, 5:27, 5:33-39; 5:56, 5:59, 5:64-65, 6:38, 6:44-45, 6:48-49, 6:53, and 7:8.

Moreover, each significant drawing describes a translation technology. A295, 2:44-51; A286-A290, Figs. 1-6. The major components of the invention relate solely to a translation system. For example, the function of "Java accelerator instruction translator 42" is described as translating bytecodes to native instructions at A296, 4:6-9, 4:29-30, 4:56-61; A297, 5:26-27, 5:39-41, 6:37-38, and 6:43. The "Execute" block 26e is described only in the context of executing native (*i.e.*, "register-based") instructions, not stack-based instructions. *E.g.*, A297, 5:22-25 ("the execute logic 26c executes the native instructions"), 6:14-15, 6:26, 6:59-60.

By consistently and uniformly describing only a translation system, Nazomi's patents fall squarely within this Court's precedent in which such consistent usage defines the term for purposes of claim construction. "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Bell Atl. Network Servs. v. Covad Commc'ns Group*, 262 F.3d 1258, 1271 (Fed. Cir. 2001).

A definition that an inventor provides through consistent usage reflects the correct construction. *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) (citations omitted) (construing claims to include "separateness" because it was consistently reflected throughout the specification

30

and the patent did not teach any alternative embodiment); *see also Hologic, Inc. v. Senorx, Inc.*, 639 F.3d 1329, 1335 (Fed. Cir. 2011) ("Claim 1 does not specify [a particular limitation]; however, the specification makes clear what the inventors contemplated as their invention . . . All the descriptions of the invention [included the limitation]"); *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011); *Technology Patents LLC v. T-Mobile (UK) Ltd*., 700 F.3d 482, 491-93 (Fed. Cir. 2012).

Claims do not operate outside the context of the disclosed invention. Claim construction instead seeks to determine what the inventor actually invented: "[A claim] term can be defined only in a way that comports with the instrument as a whole." *Markman v. Westview Instruments*, 517 U.S. 370, 389 (1996). Nothing in the specification supports Nazomi's generic construction.

### b. Nazomi's Cited Passages Confirm That The Specification Does Not Contain Any "Alternative Embodiment"

The specification belies Nazomi's argument that the patents "describe an alternative embodiment where stack-based instructions are not translated into register-based instructions." Brief at 53. The *sole* passage cited by Nazomi strongly confirms that Nazomi's patents teach only a "translation" system:

FIG. 4 illustrates an embodiment of a Java™ accelerator <u>instruction translator</u> which can be used with the present invention. The instruction buffer 70 stores the bytecode instructions from the instruction cache. The bytecodes are sent to a parallel decode unit 72 which decodes multiple

31

bytecodes at the same time. Multiple bytecodes are processed concurrently in order to allow for instruction level parallelism. <u>That is, multiple bytecodes may be converted into a lesser number of native instructions</u>.

The decoded bytecodes are sent to a state machine unit 74 and Arithmetic Logic Unit (ALU) 76. The ALU 76 is provided to rearrange the bytecode instructions to make them easier to be operated on by the state machine 74. The state machine 74 <u>converts the bytecodes into native instructions using the look-up table 78</u>. Thus, the state machine 74 provides an address which indicates the <u>location of the desired native instruction in the look-up table 78</u>. Counters are maintained to keep a count of how many entries have been placed on the operand stack, as well as to keep track of the top of the operand stack. In a preferred embodiment, the output of the look-up table 78 is augmented with indications of the registers to be operated on at line 80. The register indications are from the counters and interpreted from bytecodes. Alternately, these register indications can be sent directly to the Java™ CPU register file 48 shown in FIG. 3.

The state machine 74 has access to the Java™ registers in 44 as well as an indication of the arrangement of the stack and variables in the Java™ CPU register file 48 or in the conventional CPU register file 46. <u>The buffer 82 supplies the translated native instructions to the CPU</u>.

A297, 5:26-56 (including paragraphs before and after Nazomi's citation for context) (emphasis added). This is the only example that Nazomi can cite and yet all three paragraphs still expressly state that Nazomi's system performs translation.

This passage describes Figure 4, which shows the "Java Accelerator Instruction Translation," which includes the "Java Bytecode to Native Instruction Lookup Table," the result of which has "Native Instructions" exiting the block in the arrow to the right:

32



*FIG._4*

A288.  The specification thus describes nothing other than a translation system.

Nazomi's argument about "look-up table 78" supports Defendants' position. Brief at 53.  First, "look-up table 78" is named the "Java Bytecode to Native Instruction Lookup Table."   Second, Nazomi's cited "indications of registers" merely "augments" the Java Bytecode to Native Instruction Lookup Table 78.  It does not replace the lookup table nor does it even sniff at an alternative embodiment not involving translation.  Notably, in Nazomi 2002, Nazomi never identified "Lookup Table 78" as an alternative embodiment.

### 2.  The District Court Correctly Relied Upon The Description Of "The Present Invention" To Assist Its Construction

The district court correctly relied upon this Court's cases in using the phrase "the present invention" to construe "instruction."  While "the present invention" is not always dispositive, such language provides guidance – particularly where, as here, the specification provides a consistent and uniform description of a particular

33

aspect (translation). This Court has repeatedly relied upon such language. *E.g.*, *Regents of Univ. of Minn*, 717 F.3d at 936 ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.") (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007))); *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1277 (Fed. Cir. 2013); *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1358-59 (Fed. Cir. 2012); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).

The same principle applies here. The patentee unequivocally stated that the "present invention" relates to a Java hardware accelerator that can be used to *translate* Java bytecodes into native instructions:

> The present invention generally relates to a Java™ hardware accelerator which can be used to quickly translate Java™ bytecodes into native instructions ….

> The hardware accelerators of the present invention are not limited for use with Java™ language and can be used with any stack-based language that is to be converted to register-based native instructions.

A295, 2:7-27. These unambiguous statements are not even couched in the "in one aspect" language in *Vonage*. Thus, the district court correctly used this Court's "present invention" line of cases to guide its constructions.

*Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081 (Fed. Cir. 2003), and *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121 (Fed. Cir. 2011), do

not support Nazomi's argument because those cases presented different records. *Rambus* acknowledged that "clear language characterizing 'the present invention' may limit the ordinary meaning of claim terms" but determined that "the prosecution history shows" that "the present invention" language should not be limiting in that particular case. 318 F.3d at 1094-95. Nazomi does not cite to any comparable evidence here.

*Absolute Software* is even less helpful to Nazomi. *Absolute Software* <u>affirmed</u> the district court's limiting construction relying heavily on specification passages describing the invention which "provide strong support for the district court's construction." 659 F.3d at 1138. While *Absolute Software* declined to rely upon "present invention" because the specification "expressly contradicts earlier references to 'present invention'" (*id*. at 1137), the case reinforces that terms are construed in light of the specification.

### 3. The District Court Correctly Rejected "Nazomi's 'Some Or All' Argument"

The district court correctly ruled that Nazomi's "some or all" interpretation is "nonsensical and ignores what the patent is all about." A31. Nazomi's arguments regarding "some or all" of enumerated tasks (Brief at 57-58) make no sense for the fundamental reason that without translation of Java bytecodes into register-based instructions, the remaining tasks have no ability to be performed, no purpose in being performed, and no result in being performed.

35

None of the tasks besides translation results in Java bytecodes' being processed. For example, it is theoretically possible that a processor might do only task 5 ("generating exceptions on instructions on predetermined Java bytecodes"), but "generating exceptions" does nothing useful outside the context of the translation. It certainly does not process any Java bytecodes.

Similarly, Nazomi's argument leads to an absurd, non-functional processor because many of these functions cannot be optional. For example, the first item is "Java bytecode decode." If this function is optional (as Nazomi posits), then the processor would never process any Java instruction because "decode" is an integral part of processing <u>any</u> instruction, such as a Java bytecode. Similarly, for step #6, if the processor did not "switch[] to native CPU operation when native CPU code is provided," then that processor could not process its own native CPU instructions. Finally, any processor that only optionally performed step #8 ("managing the variables on the register file associated with the CPU") would not function properly and would output results akin to a random number generator.

Additionally, these enumerated tasks are all merely subsets of the translation process. *E.g.*, A297, 5:26-35 (describing the "decode" of "bytecodes" and "instruction level parallelism" in the contexts of the "instruction translator" in which "multiple bytecodes may be converted into a lesser number of native instructions); A296, 4:53-62 (discussing how the Java stack is stored in register

36

files because "the native register-based instructions from the Java™ accelerator instruction <u>translator</u> 42 can operate upon the operand stack and variable values stored in the Java™ CPU register file 48…").

Finally, Nazomi never explains how its specification provides enablement or written description of a processor which only optionally performed "some" (while not defining which functions fall into the "some" category) of the enumerated functions.  Nazomi also did not raise this "some or all" argument in Nazomi 2002.  The district court accurately understood that Nazomi's "some or all" argument provides a "nonsensical" result that ignores the patent specification and the purpose of the invention.

### 4. The District Court Accurately Applied Collateral Estoppel For The Construction Of "Instruction"

The district court correctly recognized that Nazomi has litigated, and lost, the issue of whether the meaning of "instruction" is bound by the specification's description of the invention.  Judge Whyte analyzed whether the "issues at stake are identical" in the previous and current cases.  A28-A29.

Nazomi's sole argument is that "[t]he district court's analysis, however, fails to consider the claims" of the various patents.  Brief at 59.  Judge Whyte clearly considered this argument and rejected it for the sound reason that the "specification should be the source of the definition of unclear terms in the claims, not a general dictionary definition such as Nazomi proposes."  A29.

Judge Whyte's ruling comports with this Court's view of "issues" for estoppel. "It is the identity of the issues litigated and decided, and which were essential to the prior judgment, that determines whether the estoppel should be applied.... There is no reason to employ a different approach in a patent context by looking to the claims litigated instead of to the issues that were decided." *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1381 (Fed. Cir. 2013) (citation omitted). "It is the issues litigated, not the specific claims around which the issues were framed, that is determinative." *Id.* at 1382 (citation omitted).

The issue in *Nazomi* 2002 was whether Nazomi's disclosure of only a translation-based system can be expanded in litigation to cover ARM's system, which was changed to not perform translation. The holding of *Nazomi* 2002 does not, and cannot, change for the related patents at issue. Judge Fogel relied upon this Court's ruling in a crucial passage that Nazomi never addresses:

> "[i]n this patent, it appears that the inventor defined 'instructions' in an indirect manner. Specifically, the specification refers primarily to what the instructions do and where they may do it." Nazomi, 403 F.3d at 1369. Consistent with the manner in which the inventor defined the term, the Court construes the term "instruction" to mean either a stack-based instruction that is to be translated into a register-based instruction…

*Nazomi*, 2006 U.S. Dist. Lexis 66354, at *22 (emphasis added). Judge Fogel and this Court reached this conclusion after exhaustively reviewing the specification—which is identical in all relevant respects to the specifications of the currently-asserted patents.

38

Collateral estoppel applies where judgment is entered as a result of claim interpretation. *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed. Cir. 1983); *In re Freeman*, 30 F.3d 1459, 1469 (Fed. Cir. 1994). Estoppel also applies when common issues are raised between cases involving related patents. *Mycogen Plant Sci., Inc. v. Monsanto Co*., 252 F.3d 1306, 1310-11 (Fed. Cir. 2001).

The issues were clearly the same in *Nazomi* 2002 as they are in the present case. In both cases, Nazomi sought a "generic," A4095, construction of the term "instruction" based upon dictionary definitions. *Compare* A4071-A4124 *with* Brief at 48-61 and A4770-A4773. In both cases, Nazomi asserted that the court "imported a limitation" regarding the translation. *Compare* A4113-A4114 *with* Brief at 4, 48. Nazomi also argued repeatedly (and unsuccessfully) that its specification supported a broader construction of "instruction" that was not limited to only a system in which stack-based instructions were translated to register-based instructions. *Compare* A4100-A4102 *with Nazomi*, 266 F. App'x 935, 938. Although the prior holding was made in the context of the previously-asserted claims, it was based on the common specification (written description), and is thus dispositive. Judge Whyte correctly applied collateral estoppel.

## C. The District Court Correctly Construed The Remaining Terms[7]

The district court separately analyzed the remaining disputed claim terms and its constructions were supported by independent analyses specific to each term. Nazomi erroneously alleges that these terms rise or fall with "instruction" and declines to address Judge Whyte's actual analyses. Moreover, Nazomi does not present any arguments for (or even discuss) Nazomi's own constructions for these terms. Nazomi therefore waives any argument directed to these constructions.

For "processing the stack-based instruction …," Judge Whyte analyzed the relationships between the "outputs" and the execution units within the claim language of claim 1 of the '362 patent and explained why the "outputs must be of the same type." A32-A33. The logical inconsistency present in Nazomi's proposed construction of this "second output" term was discussed at length in the hearing. A4633-A4635. It was also discussed extensively in the briefing, A3982-A3985, with respect to the following drawing which highlights the problem with Nazomi's positions:

---

[7] If the Court affirms the construction of "instruction" and the corresponding summary judgment, the Court need not reach the construction of these terms.



A3983.   The specification equates "the processing of Java bytecodes" with "translation."  2:61-3:2.

For "execution unit," Judge Whyte analyzed the term, its usage in the claims, and explained why he rejected both parties' proposals.  A34-A37; *see also* A4635-A4638, A3985-A3989.  Nazomi does not challenge any of Judge Whyte's analysis, does not support its own construction, and fails to provide any reasoning to overturn Judge Whyte's construction.

Finally, for "hardware accelerator," Judge Whyte evaluated the specification and claims and concluded that the specification provided the meaning of "hardware accelerator."   The specification uses "hardware accelerator" more than 30 times, and each reference is to a translation device.   This is not some mere passing reference.   *See* A3989-A3992 (citing A295-297, 1:4-67; 2:10-29; 2:61-67; 3:5-7; 3:42-44; 3:54-56; 4:6-9; 5:56-60).  The details of the "instruction translation unit" in the "hardware accelerator" all relate to the translation.  *E.g.*, A296, 4:3-7:14. Nazomi does not provide any reason to reject these constructions.

41

### D. The District Court Properly Granted Summary Judgment of Non-Infringement of the Hardware Patents Under The Doctrine Of Equivalents

Nazomi never asserted literal infringement in response to summary judgment, and only asserted a doctrine of equivalents ("DOE") theory 14 months after the deadline for doing so. Further, it did so only after stipulating to no infringement under the DOE on the same products and construction in Nazomi 2002. The district court's decision is proper because: (a) Nazomi waited until well after the deadline for asserting the DOE; (b) a finding of equivalents would vitiate the "instruction" limitation; and (c) this same exact issue of infringement was presented in Nazomi 2002 and collateral estoppel bars re-litigation of that issue.

### 1. The District Court Did Not Abuse Its Discretion in Finding That Nazomi's Assertion of Its Doctrine of Equivalents Theory Was Impermissibly Late

The district court was well within its discretion in precluding Nazomi from asserting a new DOE argument nearly three years into the litigation and more than twelve years after becoming aware of ARM's position. District courts may exclude DOE theories if those arguments are not timely disclosed pursuant to the court's local rules. *See Realtime*, 554 F. App'x at 937-38 ("The district court was well within its discretion to preclude Realtime from asserting . . . the doctrine of equivalents . . . two and a half years into the litigation . . . .").

42

This Court reviews a district court's application of its local rules with great deference. "Only if the ruling is found to be clearly erroneous is reversal mandated." *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 774 (Fed. Cir. 2002). Nazomi does not carry its heavy burden of showing that the district court's preclusion of DOE was clearly erroneous.

The Patent Local Rules required Nazomi to disclose its DOE theories in a timely fashion. A47. Despite this requirement, Nazomi never properly asserted any DOE in its infringement contentions, A581-A844, and never sought to amend those contentions despite being apprised of deficiencies, A4501-A4504.

Nazomi's new excuse that the district court adopted ARM's construction lacks merit. Brief at 65. First, parties have "an obligation to prepare for the fact that the court may adopt the other party's claim construction." *France Telecom S.A. v. Marvell Semiconductor, Inc.*, No. 12-cv-4967, 2014 WL 1899616, at *4 (N.D. Cal. May 12, 2014). The court's mere adoption of a construction that is not identical to the construction proffered by a party is not "good cause" under Patent Local Rule 3-6. *Sunpower Corp. Sys. v. Sunlink Corp.*, 2009 WL 1657987, at *1 (N.D. Cal. June 12, 2009). Second, Nazomi's argument defies the history of this case. Nazomi has been on notice of ARM's construction and non-infringement position for 12 years. A480-A499.

43

### 2. The District Court Correctly Concluded That A Finding of Equivalence Would Vitiate the "Instruction" Limitation

Summary judgment of non-infringement should be affirmed for the separate reason that there can be no equivalence as a matter of law because any such finding would impermissibly vitiate the "instruction" limitation. *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342 (Fed. Cir. 2013). In construing the "instruction" limitation, this Court and the district court found that "'instruction' *cannot mean the control signals that are the output of the decode stage*." A44; A484-5. Because this construction specifically excludes control signals (and therefore non-translation systems), Nazomi is barred from using the doctrine of equivalents to try to recapture control signals and the corresponding non-translation systems.

This Court has repeatedly emphasized that "X" cannot be equivalent to "not X." *E.g.*, *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1379 (Fed. Cir. 2006) ("A claim that specifically excludes an element cannot through a theory of equivalence be used to capture a composition that contains that expressly excluded element . . . .'"); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346 (Fed. Cir. 2001).

Against this backdrop, Nazomi raises only two purported errors in the district court's reasoning, each of which lacks merit. First, Nazomi asserts that the

district court erred in failing to consider the declaration of Nazomi's expert, Dr. Babb. Brief at 66. The district court correctly disregarded this purported evidence because Dr. Babb's declaration contradicts the proper construction of "instruction." *See* A5978; *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001) (affirming summary judgment where expert opinion contradicted the claim construction).

Second, Nazomi asserts that the district court's vitiation analysis was too perfunctory in light of *Brilliant Instruments*. Brief at 66-67. Nazomi misreads *Brilliant Instruments* which reemphasized that vitiation is properly applied when a patentee resorts to the DOE to cover an alleged equivalent that is the "antithesis" of the missing limitation. *Brilliant Instruments*, 707 F.3d at 1347-48. That is the situation here.

### 3. The District Court Properly Found That Nazomi Was Collaterally Estopped From Asserting Infringement Under the Doctrine of Equivalents

Finally, the district court correctly recognized that Nazomi actually litigated the issue of whether ARM's Revision 3 processors (also at issue here) met the "instruction" limitation in Nazomi 2002, and that Nazomi stipulated to non-infringement under the DOE in Nazomi 2002. A50. On appeal, Nazomi premises its argument on the argument that "[t]he district court's analysis . . . fail[ed] to consider" differences between the claims of the various patents. Brief at 59, 67.

Nazomi's argument contradicts this Court's precedent. Different claims do not automatically create a new issue. *See Aspex Eyewear,* 713 F.3d at 1381. "[I]t is the issues litigated, not the specific claims around which the issues were framed, that is determinative." *Id.* In the prior case, the infringement issue was whether ARM's accused products were covered by claims that required translation of the stack-based instructions to register-based instructions. That same issue is presented here regardless of any difference in claim language.

## III. THE SOFTWARE PATENT

### A. The District Court Properly Construed The Claim Terms Of The '160 Patent As They Would Have Been Understood By The Skilled Person At The Time Of The Invention

The district court's construction of the disputed terms reflects how a skilled person would have understood those terms at the time of the invention and is consistent with the specification. In contrast, Nazomi's expansive constructions are divorced from the intrinsic record, contradict its positions before the district court, and are so broad that they would render the claims invalid under section 101.

#### 1. Consistent With The '160 Patent And JVM Specification, The District Court Properly Defined "constant pool" As "a data structure attached to a single loaded class that encodes all the names that can be used by any method in the loaded class"

The most fundamental principle of claim construction is that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention, *i.e.*, as of the

46

effective filing date of the patent application." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Applying this principle, the district court correctly found that a person skilled in the art would have understood "constant pool" to be a term of art specific to Java. A56–A57 (citing Nazomi's expert (A3939–A3941)). Accordingly, Appellees disagree with Nazomi's characterization of the constant pool in its Statement of Facts. Brief at 13.

The district court correctly observed that "[t]he specification first references '*the* constant pool' in the 'background of the invention section' as if the reader is already familiar with the term." A56 (emphasis in original). In fact, the Abstract, Background, Summary, and Description of the Drawings uniformly refer to "the constant pool." A264 ("[a]n implementation of Java is disclosed in which references to the constant pool are implemented by using a Data Resolution Field within the constant pool entry"); A278–A279, 1:11–3:11 (describing "the constant pool" in the context of a "Java instruction" and referring to the JVM Specification"). Moreover, during prosecution, Nazomi referred to claim 11 in the context of describing Java bytecodes. A1619 (stating that claim 11 is "a new way of implementing reference resolution that allows the JAVA bytecodes themselves not [to] be modified."). Thus, after relying on the declarations of both experts and the specification, the district court explained that "[a]t the time of invention, the

term 'constant pool' and 'constant pool entry' were terms of art particular to Java."

A56.

As the district court noted, "Nazomi has failed to point the court to any extrinsic source for a definition of 'constant pool' that is different than the definition provided in the JVM specification." A57.    None is presented on Nazomi's appeal.  Moreover,    contrary    to    Nazomi's    bare    argument,    the specification itself recognizes that the Java constant pool is attached to a single loaded class:

> Every currently loaded class has a constant pool attached to it. The constant pool is allocated when a class is first loaded, the constants in this pool encode all the names (of variables, methods and so forth) used by any method in the class.

A56 (citing A281, 7:43–47) (emphasis added).  This description of "constant pool" in the specification is entirely consistent with the JVM Specification's definition, as noted by the district court.  A58.  This description refers to the specific term "constant pool" and provides no support for Nazomi's suggestion (Brief at 31) that the passage was only meant to describe the constant pool of Figure 8. Further, Nazomi's position that the term is broad enough to encompass more than being attached to a single class ignores the language of the specification and is mere argument lacking any support.  Brief at 32.

In addition, Nazomi mischaracterizes the patent's description of the constant pool.  Brief at 13–14.  First, contrary to the stated "definition" of the constant pool

(Brief at 13), even Nazomi has admitted that the patent does not expressly define "constant pool," A4251 ("The '160 patent does not expressly define the term "constant pool."). In addition, Nazomi inaccurately states that "if the reference to the constant pool is not resolved, *i.e.*, the constant that is being referenced by the bytecode is not found in memory, then that reference must be resolved such that the constant is loaded into memory." Brief at 14 (emphasis added). The description in the specification is quite different: If the reference to the object is not resolved, *i.e.* the object that is being referenced by the bytecode is not found in memory, then that reference must be resolved such that the object is loaded into memory. A278, 1:56–59. Nazomi thus improperly substitutes "constant pool" and "constant" for the patent's use of "object."

The JVM Specification, referenced in the '160 patent, is not extrinsic evidence because "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *V-Formation v. Benneton Group SPA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (citations omitted). Moreover, "when prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Id.* (citations omitted).

Even if the JVM Specification were considered extrinsic evidence, the district court properly considered it "particularly reliable and instructive" in construing the claims. A57. *See LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1375 (Fed. Cir. 2006) (finding that, although the patentee did not expressly adopt a definition in an incorporated industry standard, "that standard remains relevant in determining the meaning of the claim term to one of ordinary skill in the art at the time the patent application was filed, and it is treated as intrinsic evidence for claim construction purposes"), *rev'd on other grounds*, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008); *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1044-45 (Fed. Cir. 2000) ("Even when prior art is not cited in the written description or the prosecution history, it may assist in ascertaining the meaning of a term to a person skilled in the art.").

The statement in the specification that "Java . . . should be construed to" include "successor programming languages . . . using basic Java concepts," A281, 7:35-39, does not support Nazomi's broad construction of constant pool. Nazomi chose to assert claims that expressly require a "constant pool"—a defined term of art specific to Java. Nazomi knew how to draft broader claims that were not Java-specific, such as claim 1, which recites a generic "data structure" instead of claim 11's more Java-specific recitation of "a constant pool." A282 (*compare* claim 1 *with* claim 11). Even if this statement arguably supported broader

50

claims—a point Appellees do not concede—it would, at most, apply to unasserted claim 1.

Moreover, as the district court correctly observed, the doctrine of claim differentiation precludes Nazomi's original proposed construction of "a data structure that includes at least one constant pool entry," because it would have conflated "constant pool" with the more general "data structure." A57-A58. *See, e.g., Seachange Int'l, Inc. v. C-COR Inc.,* 413 F.3d 1361, 1368-69 (Fed. Cir. 2005). Such a construction would "undermine the fair notice function of the requirement that the patentee distinctly claim the subject matter disclosed in the patent from which he can exclude others temporarily." *Athletic Alternatives, Inc. v. Prince Mfg. Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996). Furthermore, Nazomi's expert offers no definition of "constant pool," and distinguishes over prior art that allegedly does not show a constant pool. A3953. Nazomi's expert testimony discussing other virtual machines that allegedly do not comply with the JVM Specification is irrelevant and does not even allege that the constant pools used in those virtual machines are any different than the Java constant pool. Brief at 33-34.

Recognizing the problems with its original construction, Nazomi proposes a new construction on appeal that the "constant pool" is a "data structure that is a pool of constants." Brief at 30. This construction is substantially different from

51

Nazomi's proposed construction at the district court, as discussed above.   A55. "[A] party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below." *Digital-Vending Services Int'l, LLC, v. The Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1273 (Fed. Cir. 2012) (citations omitted).  Because *Digital-Vending Services* and similar precedent preclude Nazomi's belated construction, it need not be considered on appeal.  Even if considered, this new construction suffers the same flaws (discussed above) as the original one the district court properly rejected.

> ## 2. The Term "indication of a reference that may need resolution" Was Properly Construed As "an identification of a location (e.g., an address) within the constant pool that stores the name, or 'label,' of a reference that needs resolution"

Claim 11 includes two separate limitations that Nazomi attempts to conflate into one: "indication of a reference that may need resolution," and "resolution data field" containing data indicating whether a reference has been resolved. A282. The district court's constructions and Nazomi's constructions are shown in the table below (emphases added):

| Claim 11 | District Court's Construction | Nazomi's Construction |
|---|---|---|
| ". . . the constant pool entry storing <u>an indication of a reference that may need resolution</u>;" A282, 10:2-4. | An <u>indication of a reference that may need resolution</u> is "an identification of a location (e.g., an address) within the constant pool that stores the name, or 'label,' of a reference that needs resolution." A67. | "data that <u>indicates whether a reference has been resolved</u>," Brief at 43. |
| obtaining data from the constant pool entry including data from "<u>a resolution data field,</u>" A282, 10:5-6. | A <u>resolution data field</u> is "a data field within the constant pool entry that contains <u>data indicating whether a reference has been resolved</u>." A67. | <u>No dispute</u>. |

On appeal, Nazomi does not dispute the district court's construction of "resolution data field." Brief at 44. Instead, Nazomi urges "an interpretation" of the district court's construction that would permit these two separately recited terms to mean the exact same thing. Brief at 36–43. As illustrated above, Nazomi's proposed construction of "an indication of a reference that may need resolution" <u>entirely subsumes</u> the undisputed construction of "resolution data field." This contradicts the well-established principle that different claim terms connote different meanings. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381–82 (Fed. Cir. 2008). Essentially, Nazomi's proposed constructions would read one of the limitations entirely out of the claim. *Bicon,*

*Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim"). This Court rejected a similar argument in *Augme*, 2014 U.S. App. LEXIS 11606, at *12–13 (claim separately reciting that one code module is "embedded" and another is "downloaded" means that "embedded" means something different from "downloaded").

As the district court correctly observed, the plain language of the claim requires "an indication of ***a reference***," A62–A63 (emphasis in original), not an "indication" in the abstract. Claim 11's context confirms this meaningful distinction. Specifically, the claim distinguishes between "an <u>indication</u> of a reference" and other data that provides for other types of indications (*i.e.*, "if the data . . . <u>indicates</u> that the reference was not resolved" and "modifying the data . . . <u>to indicate</u> that the reference is resolved"). A282, 10:3-16. *See Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."). Additionally, dependent claims 17 and 20 recite the entire phrase "indication of a reference" to invoke their antecedent bases, and do not refer to a generic indication. A282, 10:28–37. The district court's construction comports with the requirement of "indicating a reference" by identifying a location that stores the name or label of the relevant reference. A64-65.

Nazomi's proposed construction, "data that indicates <u>whether a reference has been resolved</u>," A62 (emphasis added), contradicts the claim language in two ways. First, as the district court noted, it overlooks the fact that the claim language requires "an indication of ***a reference***." A62–A63. Data that shows whether a reference has been resolved does not provide information about which particular reference has been resolved. Second, it actually changes the claim language, "that may need resolution," to "has been resolved." The district court correctly rejected Nazomi's construction because "the 'resolution data field,' and not the 'indication of a reference that may need resolution,' indicates whether a reference has been resolved." A63.

As shown by a comparison between relevant portions of claim 11 and the descriptions of Figures 9A and 9B (emphases added), the specification further supports the district court's construction that the "indication of a reference" and the "resolution data field" limitations are two different limitations that provide completely different functions.

| Claim | Specification |
|---|---|
| 11.  obtaining from an instruction storage location <u>an instruction that references an entry in a constant pool</u>, | "[A] bytecode . . . references the constant pool." A281, 8:21-22. |
| <u>the constant pool entry storing an indication of a reference that may need resolution</u>, | "<u>The constant pool entries include . . . [an] indication field 162. In this case, the indication '5002' points to address '5002' that contains the data 'ABC'</u>." A281, 8:24-27. |
| obtaining data from the constant pool entry, including<u> data from a resolution data field</u>; | "The constant pool entries include a resolution data field 160 . . . ." *Id.* 8:24-25. |
| <u>using data from the resolution data field to determine whether to do a resolving step</u>. . . , | "<u>The resolution data field indicates that the reference to the object [ABC] has not been resolved</u>." *Id.*, 8:27-29. |

Figures 9A and 9B illustrate how these 2 terms are used in the specification to provide different functions.  A constant pool entry has been updated to use a single-bit Resolution Data Field 160.  A275–A276, Figs. 9A and 9B; A281, 8:17–51.  In Figure 9A, the Indication Field 162 stores the "indication of a reference that may need resolution"—the address of the constant pool entry that stores the name of the reference that needs resolution thereby identifying which reference is at issue.  In Figure 9A (shown in annotated form, below), the Resolution Data Field 160 has a value of "0" 152a indicating that the reference is unresolved.  A275, Fig. 9A; A281, 8:17–51.

56



In Figure 9B, the Resolution Data Field 160 has a value of "1" 152a' indicating that the reference has been resolved, and the Indication Field 162' has been updated to store the address where the object has been loaded into memory. A276, Fig. 9B; A281, 8:17–51.



A276, Fig. 9B (italicized annotations added).

The district court also correctly rejected Nazomi's argument, raised again on appeal, that "reference resolution field" 180a in Figure 10 corresponds to the indication limitation. Brief at 40. The district court noted that this argument is contradicted by the natural interpretation of Figure 10 in view of the specification. A63–A64.



**FIG._10**

Figure 10 illustrates a constant pool entry that uses a two-bit resolution data field.  A277, Fig. 10 (italicized annotations added); A289.  Although Figure 10 does not label field 180a as a "data resolution field" or "resolution data field," the field stores the data which indicates whether a reference has been resolved. Specifically, the two-digit codes 00 and 01 in reference resolution field 180a correspond to the single digit codes 0 and 1 in resolution data field 160 shown in Figures 9A and 9B.  A277, Fig. 10; A281, 8:52–60.  Contrary to Nazomi's argument, resolution field 180a does not "indicate a reference" as required by the "indication limitation."  Brief at 40.  Even if field 180a identifies whether the reference is a Java object, it does not provide any information identifying what particular reference is to be resolved.  Moreover, Figure 10 also includes an "indication field," field 180b.  This field corresponds to the indication field 162 of Figures 9A and 9B, which before resolution identifies an "indication of a reference that may need resolution" (*i.e.*, the address of the constant pool entry that stores the

name of the reference that needs resolution (*i.e.*, a non-Java address), and after resolution stores the Java object address).  A277, Fig. 10; A281, 8:52–60.  Thus, the district court's construction is entirely consistent with Figure 10's embodiment of a constant pool entry.  *See* A63 (the district court reconciling its construction with Fig. 10).

The district court also correctly rejected Nazomi's claim differentiation argument because it conflicts with the claim language and the specification.  A62-A63; Brief at 38. Moreover, a simple comparison reveals that the district court's construction:  "an identification of a location (*e.g.*, an address) within the constant pool that stores the name, or 'label,' of a reference that needs resolution," is not the same in scope as the additional limitation of claim 17: "wherein the indication of a reference points to a label of an object that may or may not be loaded into memory."  A282: 10:28–30.  *See Seachange Int'l*, 413 F.3d at 1369 ("[C]laim differentiation can not broaden claims beyond their correct scope . . . claims that are written in different words may ultimately cover substantially the same subject matter." (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998))).

### 3.  The Term "Instruction" Was Properly Construed

As discussed in the hardware patent section *supra*, the district court properly construed the term "instruction" identically for the hardware and software patents.

60

### B.   The District Court Properly Granted Summary Judgment of Non-Infringement of the '160 Patent

This Court may affirm the district court's judgment of non-infringement on two independent grounds: (1) the district court's rejection of Nazomi's doctrine of equivalents argument as to the "constant pool" limitation. A87-89; or (2) the district court's finding that the "indication of a reference that may need resolution" is "not met by the accused products." A90.  Because Nazomi makes no infringement argument based on the district court's construction (Brief at 47), the construction of the "indication of a reference" limitation may, alone, be dispositive of Nazomi's appeal.

### 1.  The Accused Products

The products accused of infringing the '160 Patent are devices that run Google's Android operating system.   A81, A2087–A2088.   The accused technology relates to portions of Android's Dalvik Virtual Machine ("DVM").

Because the DVM cannot execute Java programs, *id.*, A3942, a special translation tool must be used to transform Java class files into a Dalvik Executable file (".dex", or the "Dex file").  *Id*.; A82.  The Dex file contains Dalvik bytecodes and is executable by the DVM after additional steps are performed.  *Id*.  After a Java program is converted into a Dex file, the Dex file has only a single constant pool that includes a combination of the constants from each of the Java class files. A82; A2088 (referencing an illustration from a third party's presentation).

61



### 2. The District Court Properly Granted Summary Judgment of Non-Infringement Based on the "Constant Pool" Limitation

#### a. Nazomi Conceded That The Accused Products Do Not Literally Include A "Constant Pool" Under The District Court's Construction

Nazomi conceded that the accused products do not include a constant pool that meets the district court's definition for constant pool: a "data structure attached to a single loaded class that encodes all the names that can be used by any method in the loaded class." Brief at 44–45. Accordingly, if this Court affirms the district court's claim construction, then this Court should affirm the judgment of no literal infringement.

### b. As The District Court Correctly Found, Nazomi Waived The Doctrine of Equivalents

On appeal, Nazomi contends only that the "'constant pool' element was met under the doctrine of equivalents." Brief at 44. However, the district court found that Nazomi waived the doctrine of equivalents ("DOE") by failing to comply with the Patent Local Rules. A87–A88. Nazomi does not contest this finding on appeal. Thus, the district court's judgment rejecting Nazomi's DOE argument should be affirmed.

To the extent it may be relevant here, the district court incorrectly noted that Appellees did not "raise any objection to Nazomi's [DOE] argument." A88. On the contrary, in their reply brief, Appellees objected to Nazomi's DOE argument because Nazomi did not comply with Patent Local Rule 3-1(e), and because it was conclusory. A4575–A4576.

### c. The District Court Correctly Found, In The Alternative, That Nazomi Failed To Raise Any Issues of Fact Under The Doctrine of Equivalents

In the alternative, the district court found no infringement under the DOE because Nazomi failed to show that there was any genuine issue of whether the accused devices include an equivalent of the <u>constant pool</u> limitation. For purposes of Appellees' motion for summary judgment, the district court gave Nazomi the benefit of the doubt, considering "the entire DvmDex structure, including pResMethods, to be the accused 'constant pool.'" A86. Appellees do

63

not concede this finding.  But even applying this incorrect finding, the district court properly found that Nazomi failed to raise a genuine issue of fact because it relied only on conclusory expert testimony.  A87–A89.

To sustain a claim for infringement under the DOE, "a patentee must . . . provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test."  *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996); *see also Augme*, 2014 U.S. App. LEXIS 11606, at *22.  "Such evidence must be presented on a limitation-by-limitation basis."  *Tex. Instruments*, 90 F.3d at 1567.  Generalized, conclusory testimony by a party or its expert is insufficient to create a genuine issue of material fact.  *See Am. Calcar*, *Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1338-39 (Fed. Cir. 2011); *see also Gemalto S.A., v. HTC Corp.*, 2014 U.S. App. LEXIS 11520, at *23–27 (Fed. Cir. June 19, 2014).

The district court found that Nazomi failed to prove that the accused products "operate[] in substantially the same way as the Java constant pool."  A88-A89.  In particular, the district court found the testimony of Nazomi's expert, Dr. Levitt, failed to raise an issue of fact because it was merely conclusory.  *Id.  See*, *e.g.*, *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005) (affirming summary judgment because "[t]he expert declaration and other

64

evidence relied on by Network Commerce supporting infringement by equivalents [were] generalized and d[id] not provide particularized testimony and linking argument on a limitation-by-limitation basis."); *see also Gen. Elec. v. Nintendo Co.*, 179 F.3d 1350, 1359 n.5 (Fed. Cir. 1999) (finding that a "conclusory assertion of equivalence is insufficient to establish a genuine issue of material fact").

As such, the district court properly rejected Dr. Levitt's conclusory statement that "the constant pool in the .dex file operates in substantially the same way to yield the substantially same result" based on Dr. Levitt's observation that the same application appeared to work the same way in an Android device as in a Java program. A88.  As the district court explained, "[a]lthough Dr. Levitt states that the Dalvik Virtual Machine accomplishes an 'equivalent' result, he offers minimal to no explanation of any 'substantially similar *way*' in which the Dalvik Virtual Machine achieves that 'equivalent result.'"  A88.

Nazomi's generalized argument that "Dalvik's constant pool operates in substantially the same ways as the Java constant pool" fails because it lacks the required element-by-element analysis of claim 11. *See Warner-Jenkinson Co., Inc.v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997).  Nazomi does not (and cannot) explain how the alleged "constant pool" of the DVM performs the necessary steps in claim 11, including:  "obtaining data from the constant pool entry including data from a resolution data field" and "if the data in the data

resolution field indicates that the reference was not resolved, resolving the reference and, thereafter, modifying the data in the constant pool entry including modifying the data in the resolution data field to indicate that the reference has been resolved."

Moreover, Nazomi's brief does not ever identify the accused "Dalvik constant pool." Instead, Nazomi refers to "the Dalvik constant pool" and cites to expert testimony that discusses three Dalvik structures:

- the Dex file, Brief at 46 (.dex file illustration titled the "Dalvik Constant Pool"),

- the pResMethods array, Brief at 46 ("the constant pool entry (e.g., entry in pResMethods)"), and

- a "DvmDex structure," Brief at 46 ("the constant pool in Dalvik (*e.g.*, DvmDex structure)").

Brief at 45–47 (citing A3943-A3944; A3946–A3951 (interchangeably referring to the three structures)). Nazomi provides no evidence as to how the steps of claim 11 are performed in the same way by any of these three alleged "constant pools."

In addition, Nazomi ignores the undisputed differences in the record between the Dex file constant pool and the claimed Java constant pool. Nazomi's argument that the Dalvik constant pool "saves memory by removing the repetition of the same constants in different Java classes" (Brief at 46) actually points out a

significant difference (and improvement) with Dalvik. *See e.g.*, *Augme,* 2014 U.S. App. LEXIS 11606, at *20–22. The fact that the Dex file constant pool "combines the constants from each of the constant pools" (Brief at 45) is not sufficient to make it equivalent to the Java constant pool.

Further, Dr. August's unrefuted testimony established other significant differences. When a Java program is loaded, it creates a constant pool for each class that is allocated to memory, which contains a copy of the names (references to fields, methods, etc.) found in the Java class file and is modified during executing of the Java program based on resolution of references. A2087; *see also* A281, 7:44-45 ("[t]he constant pool is allocated when a class is first loaded"). The Java constant pool that is allocated to memory may differ from the constant_pool of the Java class file in that it may contain additional data specific to the current execution of the Java program. A2087.

In contrast, the Dex file constant pool <u>is not</u> allocated to memory and <u>is not</u> modified during program execution. A2089. Thus, the only evidence established that the Java and Dex file constant pools are used in different ways, and the district court recognized these distinctions. A81–A82.

As this Court held in *Network Commerce* and *General Electric*, general conclusions of equivalence are not enough. Thus, the Court should likewise find

67

that Nazomi's conclusions are not enough and affirm the district court's decision granting summary judgment of no infringement under the DOE.

Moreover, Nazomi's argument that pResMethods is "associated" with the Dex file constant pool actually concedes that pResMethods is <u>not in</u> the Dex file constant pool. If one were to assume that pResMethods, a single field array, were "within" the Dex file constant pool due to its mere "association" with the constant pool, then the JVM Specification would anticipate the claim because it discloses also an array that is "associated with" the Java constant pool, as illustrated below:



*See* A4567–A4568 (Defendants' MSJ Reply Brief).

Finally, Dr. Levitt's conclusory testimony is internally inconsistent. On the one hand, for infringement purposes, Dr. Levitt argued that pResMethods is "associated with" the Dex file. A3945–A3946 ("wraps . . . around" and

"associated with").   On the other hand, Dr. Levitt also distinguished the JVM Specification prior art "array," A957 and A990–A1023, on the basis that the prior art's fields for tracking past resolution are not contained within the prior art's constant pool.   A3952 ("separate from"), A3954–A3955 ("not contained within") and A3956–A3957 ("separate from" and "not in").   Dr. Levitt's infringement and invalidity positions cannot be reconciled.   *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("claims are construed the same way for both invalidity and infringement.").   Moreover, the DOE cannot expand the scope of the claims to ensnare the prior art.  *Augme*, 2014 U.S. App. LEXIS 11606, at *19–20 ("[T]he concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims") (quotations omitted); *Gemalto*, 2014 U.S. App. LEXIS 11520, at *27–28.

Accordingly, the district court correctly found that Nazomi's contradictory and conclusory expert evidence fails to establish a genuine issue of material fact.

### 3.  The District Court Properly Granted Summary Judgment of Non-Infringement Based on the "Indication of a Reference That May Need Resolution" Limitation

Nazomi concedes that under the district court's construction, the "indication of a reference that may need resolution" is not found in the accused products. Brief at 47.   Indeed, the district court found that regardless of whether the data field in pResMethods array could be a data resolution field, "the only field in the

pResMethods entry does not contain 'an indication of a reference that may need resolution,' and thus this limitation is not met by the accused products."   A90. Thus, affirming the district court's construction of the "indication of a reference" limitation provides an independent basis for affirming the district court's judgment of non-infringement.

## CONCLUSION

For the reasons set forth above, the judgment of the district court should be affirmed.

Dated:  July 14, 2014

/s/ Kevin P. Anderson

Kevin P. Anderson
Karin A. Hessler
Robert J. Scheffel

**WILEY REIN LLP**
1776 K Street NW
Washington, DC  20006
Telephone:  202.719.7000
Facsimile:   202.719.7049

*Attorneys for Defendants ARM, Ltd. and ARM, Inc.*

*/s/ Steven T. Snyder*

Alexas D. Skucas
N.Y. State Bar No. 2666774
askucas@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

Steven T. Snyder
N.C. Bar No. 40421
ssnyder@kslaw.com
KING & SPALDING LLP
100 N. Tryon Street, Suite 3900
Charlotte, NC 28202
Telephone: (704) 503-2630
Facsimile: (704) 503-2622

Donald F. Zimmer, Jr.
fzimmer@kslaw.com
Cheryl A. Sabnis (SBN 224323)
csabnis@kslaw.com
KING & SPALDING LLP
101 Second Street – Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

*Attorneys for Defendants Microsoft Mobile Oy and Nokia Inc.*

*/s/Kevin G. McBride*

Kevin G. McBride
AKIN GUMP STRAUSS HAUER & FELD LLP
4 Park Plaza, Suite 1900
Irvine, California 92614
Telephone: (949) 885-4100
Facsimile: (949) 885-4101
kmcbride@akingump.com


James L. Duncan III
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor
Houston, Texas 77002
Telephone: (713) 220-5800
Facsimile: (713) 236-0822
jduncan@akingump.com

*Attorneys for Defendant VIZIO Inc.*

*/s/ Mary-Olga Lovett*_____

Mary-Olga Lovett
E-mail: lovettm@gtlaw.com

Ira R. Hatton
E-mail: hattoni@gtlaw.com

Dwayne L. Mason
E-mail: masondl@gtlaw.com

GREENBERG TRAURIG LLP
1000 Louisiana St. Suite 1700
Houston, Texas 77002
Telephone:  713.374.3541
Facsimile:   713.754.7541

*Attorneys for Defendant* AMAZON.COM.

*/s/ Nicholas J. Kim*

Nicholas J. Kim
*Counsel of Record*
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave. N.W.
Washington, DC 20004
T: (202) 739-3000
F: (202) 739-3333
E: *nkim@morganlewis.com*

Brett M. Schuman
**MORGAN, LEWIS & BOCKIUS LLP**
1 Market Street
Spear Street Tower
San Francisco, CA 94105
T: (415) 442-1024
F: (415) 442-1001
E: *bschuman@morganlewis.com*

*Attorneys for Defendants-Appellees*
*LG Electronics Inc. &*
*LG Electronics MobileComm U.S.A., Inc.*

*/s/ Erik R. Fuehrer*
Mark D. Fowler
Robert Buergi
Erik R. Fuehrer
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303
Telephone: (650) 833-2000
Facsimile: (650) 833-2001

Stanley J. Panikowski
DLA Piper LLP (US)
401 B Street
Suite 1700
San Diego, CA 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701

*Attorneys for Defendants-Appellees*
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC, SAMSUNG ELECTRONICS
CO., LTD., and SAMSUNG ELECTRONICS
AMERICA, INC.

_____/s/ John B. Sganga_____

JOHN B. SGANGA
  *Counsel of Record*
AMY C. CHUN
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

MAURICIO A. URIBE
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1420 Fifth Avenue, Suite 3600
Seattle, WA 98101
(206) 405-2000

*Attorneys for Defendants-Appellees*
*HTC CORPORATION and*
*HTC AMERICA, INC.*


*/s/ Eric C. Cohen*_____

Eric C. Cohen
Michael A. Dorfman
KATTEN MUCHIN ROSENMAN LLP
525 West. Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
Facsimile: (312) 902-1061
eric.cohen@kattenlaw.com
michael.dorfman@kattenlaw.com

*Attorneys    for    Defendant    Kyocera*
*Communications, Inc.*

76

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 14, 2014, the following counsel of record for Plaintiff were served via the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

William D. Belanger
Alison L. McCarthy
Frank D. Liu
PEPPER HAMILTON LLP
19th Floor, High Street Tower
125 High Street
Boston, MA 02110-2736
617.204.5100
617.204.5150 (facsimile)

<u>July 14, 2014</u>                              */s/ Kevin P. Anderson*

Kevin P. Anderson (admitted *pro hac vice*)
kanderson@wileyrein.com
**WILEY REIN LLP**
1776 K Street NW
Washington, DC  20006
Telephone:  202.719.7000
Facsimile:   202.719.7049

*Attorneys for Defendants ARM, Ltd. and ARM, Inc.*

77

## <u>CERTIFICATE OF COMPLIANCE</u>

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   <u> X </u>  The brief contains 13,940 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

   _____  The brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   <u>X   </u>  The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2013</u> in a <u>14 point Times New Roman font</u> or

   _____The brief has been prepared in a monospaced typeface using in a ____ characters per inch_____ font.

<u>July 14, 2014</u>                                 */s/ Kevin P. Anderson*

                                             Kevin P. Anderson (admitted *pro hac vice*)
                                           kanderson@wileyrein.com
                                           **WILEY REIN LLP**
                                           1776 K Street NW
                                           Washington, DC  20006
                                           Telephone:  202.719.7000
                                           Facsimile:   202.719.7049

                                           *Attorneys for Defendants ARM, Ltd. and ARM, Inc.*